**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE ELIZABETH CONDOMINIUM | * | |
| ASSOCIATION, INC., *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No. 8:25-CV-01019-DLB |
| | * | |
| MONTGOMERY COUNTY, | * | |
| MARYLAND, | * | |
| | * | |
| Defendant. | * | |

**TABLE OF CONTENTS FOR DEFENDANT MONTGOMERY COUNTY,
MARYLAND'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

I.  INTRODUCTION ................................................................. 1

II.  UNDISPUTED MATERIAL FACTS .......................................... 3

*In 2014, the County Began to Measure Energy Performance of
Large Commercial and County-Owned Buildings as Part of its
Existing Efforts to Reduce Greenhouse Gas Emissions*.................................3

*To Combat Global Warming and Climate Change, the County Council in 2017
Adopts a Goal of Zero Greenhouse Gas Emissions by 2035* .........................4

*The County Enacts the BEPS Law As Part of Its Efforts to
Meet the Zero Greenhouse Gas Emissions Goal* ........................................6

III.  LEGAL STANDARD ........................................................... 11

A.  Dismissal Under Rule 12(b)(6) ................................................ 11

B.  Summary Judgment Under Rule 56(a) ......................................... 12

IV.  ARGUMENTS.................................................................... 13

A.  Plaintiffs Fail to State a Claim for Which Relief can be Granted
Because Defendant's Bill Is Not Preempted By Federal Law.................13

i

1. Federal Preemption Analysis Focuses on Congressional Intent. ....................... 14

2. The Plain Language of the EPCA Demonstrates that the BEPS Law Falls Outside the Scope of EPCA's Express Preemption Provision .......................................15

3. The Legislative History of the EPCA's Express Preemption Provision Demonstrates that the BEPS Law Falls Outside Its Scope ...............................20

4. The BEPS Law does not Conflict with the EPCA Because it Does not Frustrate Compliance with the EPCA or Congressional Purposes ...................................21

5. Plaintiffs' Reliance on *Berkeley* is Misplaced ...................................................22

B. Plaintiffs Are Not Entitled to Attorney's Fees and Costs. .......................................26

V.     CONCLUSION..........................................................................................................27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| THE ELIZABETH CONDOMINIUM ASSOCIATION, INC., *et al.*, | * |
| | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | *    Case No. 8:25-CV-01019-DLB |
| | * |
| MONTGOMERY COUNTY, MARYLAND, | * |
| | * |
| | * |
| Defendant. | * |

**DEFENDANT MONTGOMERY COUNTY, MARYLAND'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS, OR,
IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** Defendant, Montgomery County, Maryland ("the County"), and files this Memorandum of Law in Support of its Motion to Dismiss, or, in the alternative, Motion for Summary Judgment, and states the following in support thereof:

**I.    INTRODUCTION**

Concerned with the effects of global warming and climate change on public health and safety, the County adopted a goal to reduce greenhouse gas emissions in the County by 80% in 2027, and by 100% in 2035.[1] As part of its efforts to meet that goal, the County enacted Bill No. 16-21, "Environmental Sustainability - Building Energy Use Benchmarking and Performance Standards," and  promulgated Montgomery County Executive Regulation 17-23AM to implement

---

[1]    *See* **Exhibit 1,** Montgomery County Resolution No. 18-974, "Energy Climate Mobilization" (December 5, 2017).

the law (collectively the "BEPS Law").[2] To improve the energy performance of buildings, the BEPS Law sets energy performance standards for buildings of a certain size in the County and with a goal of reducing their greenhouse gas emissions.

Plaintiffs' one-count Complaint contends that a federal law, the Energy Policy and Conservation Act ("EPCA"), 42. U.S.C. §§ 6201-6422, preempts the BEPS Law. The EPCA sets national energy conservation standards for consumer appliances and industrial equipment. Contrary to Plaintiffs' legal theory, the BEPS Law's performance standards for **buildings** have no impact whatsoever on the EPCA's **appliance** and **equipment** energy conservation standards. To that end, the Complaint is devoid of any allegation that a single appliance or equipment manufacturer has had to alter their design or manufacturing protocols because of the BEPS Law.

The EPCA does have an express preemption clause that prohibits state and local regulation "concerning energy use [and] energy efficiency." But the BEPS law impacts neither "energy use" nor "energy efficiency" as defined by the EPCA. Plaintiffs' flawed legal conclusion that the BEPS Law concerns "energy use" and "energy efficiency" would require this Court to omit half of the

---

[2]    *See* **Exhibit 2**, Bill No. 16-21, "Environmental Sustainability – Building Energy Use Benchmarking and Performance Standards – Amendments"; **Exhibit 3**, Bill No. 21-16 as codified in Article 6 of Chapter 18A of the County Code; **Exhibit 4,** Montgomery County Executive Regulation 17-23AM, Building Energy Performance Standards; **Exhibit 5,** Regulation 17-23AM as codified in Code of Montgomery County Regulations (COMCOR) §§ 18A-43A.01.01-.16
   The full legislative history of Bill No. 16-21, from its introduction, public hearing, four County Council committee hearings, to its final enactment, is available online at: https://apps.montgomerycountymd.gov/ccllims/BillDetailsPage?RecordId=2707&fullTextSearch=16-21.
   The County Code in full as well as all County regulations (COMCOR) are available online at: https://codelibrary.amlegal.com/codes/montgomerycounty/latest/montgomeryco_md/0-0-0-115924
https://codelibrary.amlegal.com/codes/montgomerycounty/latest/montgomeryco_md_comcor/0-0-0-1

EPCA's definitions for "energy use" and "energy efficiency." The complete definitions for those terms reveal the EPCA does not implicate, let alone preempt, the BEPS Law.

Thus, the Complaint should be dismissed for failure to state a claim. In the alternative, this Court should grant summary judgment in favor of the County. Further, Plaintiffs' prayer for relief for costs of the lawsuit, including reasonable attorney's fees, must be denied as there is no legal basis for an award of attorney's fees.

## II.     UNDISPUTED AND MATERIAL FACTS

### *In 2014, the County Began to Measure Energy Performance of Large Commercial and County-Owned Buildings as Part of its Existing Efforts to Reduce Greenhouse Gas Emissions.*

In 2014, the County amended Chapter 18A of its Code, "Environmental Sustainability," to add a new Article 6, "Building Energy Use Benchmarking."[3] The benchmarking law applied to County-owned and commercial building areas greater than 50,000 square feet, and required their owners to annually benchmark and report building and energy performance details to the County's Department of Environmental Protection ("DEP").[4] To benchmark the performance, a building owner had to annually input energy consumption data for a 12-month period into the U.S. Environmental Protection Agency (EPA)'s online software, known as ENERGY STAR Portfolio Manager.[5] The EPA makes ENERGY STAR Portfolio Manager available for free to track, assess, and score energy use of commercial buildings and industrial plants.[6] The DEP Director could

---

[3]     *See* **Exhibit 6** County Bill No. 2-14, "Environmental Sustainability – Buildings – Benchmarking."

[4]     *See* Ex. 6, Bill No. 2-14, at Lines 11-13, 20-23, 47-55, 79-101.

[5]     *See* https://www.energystar.gov/buildings/benchmark; Ex. 6, Bill No. 2-14, at Lines 11-13, 79-101.

[6]     *See* https://www.energystar.gov/buildings/about-us.

waive the benchmarking requirements for buildings in financial distress, with less than half occupancy, and that were still under construction.[7] The County amended Article 6's benchmarking requirements in 2015 to add statements of intent to the Article, specify the type of professional that may verify the benchmarking value, and to permit a waiver if a building achieved a specific performance score.[8]

The 2014 Bill was part of several bills introduced by the then-Chair of the Council's Transportation, Infrastructure, Energy and Environment Committee to reach the County's greenhouse gas reduction goals, set in 2008, to reduce greenhouse gas emissions by 80% by 2050.[9]

### *To Combat Global Warming and Climate Change, the County Council in 2017 Adopts a Goal of Zero Greenhouse Gas Emissions by 2035.*

In 2017, the Montgomery County Council adopted Resolution Number 18-974, "Emergency Climate Mobilization."[10] The Resolution observed that global warming wrought "cataclysmic" changes to Earth, including heat waves, droughts, and super storms,[11] and that climate change "will cause an increase in water and food shortages, civil unrest, state failure, civil

---

[7]     *See* Ex. 6, Bill No. 2-14, at Lines 102-114.

[8]     *See* County Bill No. 35-15, "Environmental Sustainability – Amendments," available online at: https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=985_1_1432_Bill _35-15_Signed_20160223.pdf. *See also* https://www.energystar.gov/buildings/building-recognition/building-certification.

[9]     *See* **Exhibit 7**, Montgomery Cnty. Council, Agenda Item #5A, Introduction, January 28, 2014, at 21; **Exhibit 8,** Bill No. 32-07, "Environmental Sustainability – Climate Protection Plan," Lines 205-212. The County Code mandates promulgation of a Climate Protection Plan, which must track the County's progress on reducing greenhouse gas emission by 80% by 2050. *See* Montgomery County Code §§ 18A-12; 18A-15(b).

[10]     *See* Ex. 1.

[11]     *See* Ex. 1 ¶ 1.

war and terrorism throughout the world, with no nation or region being immune from its effects, including Montgomery County." *See* Ex. 1 ¶¶ 1-3. The Council found a strong scientific consensus exists that global warming could be mitigated by reducing greenhouse gas emissions and removing excess carbon from the atmosphere. *See id.* ¶¶ 4-5. The Council stated, "[w]e must together implement a massive emergency global mobilization effort to successfully eliminate greenhouse gas emission and remove excess carbon from the atmosphere." *See id.* ¶ 5. The Council resolved to reduce greenhouse gas emissions in the County by 80% by 2027, and to reach 100% elimination of greenhouse gas emissions by 2035. *See id.* at 2. The Council called upon the County Executive and others to advise the Council on specific methods the County can take to accelerate its greenhouse gas emissions reduction goals. *See id.*

Steps taken to date by the County to implement the resolution include:

- A September 2020 law that provided a "green building" tax credit for new and existing energy efficient buildings;[12]

- A 2021 regulation that clarifies requirements for new commercial construction projects and major building additions, including energy efficiency improvements and health performance of building sites and structures;[13]

---

[12]    *See* https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2649_1_10947_B ill_10-20_Signed_20200929.pdf.

[13]    *See* Montgomery Cnty. Council, Agenda Item #5B, Staff Report, April 19, 2022, at page 7 of 366 (available at: https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2707_1_20163_B ill_16-21_Action_20220419.pdf); *see also* Executive Regulation 12-20, Adoption of the 2018 International Green Construction Code (IgCC), Staff Report dated September 23, 2021. (available at: https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2021/20210928/202 10928_3B.pdf.).

- Enactment of a law that requires adoption of a building code that restricts natural gas in new construction by December 31, 2026;[14] and

- Annual funding of approximately $20 million to the County's Green Bank, which encourages and provides financing for clean energy projects in the County.[15]

### The County Enacts the BEPS Law As Part of Its Efforts to Meet the Zero Greenhouse Gas Emissions Goal.

In April 2021, the County Executive transmitted a proposed Bill, which would become Bill 16-21, to the Council for its consideration.[16] Proposed Bill 16-21 expanded the number of buildings covered by benchmarking requirements and established energy performance standards for existing buildings.[17] The performance standards would be implemented with a phased approach, with interim and final performance requirements for covered buildings.[18]

The County Executive's transmittal memorandum to the Council explained his rationale for the proposed law. In the Executive's view, existing policies fell short of achieving the County's climate goals.[19] The existing County building benchmarking requirements, without any

---

[14]    *See* County Bill 13-22, "Buildings – Comprehensive Building Decarbonization" (available at: https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2754_1_23710_B ill_13-22_Signed_20221212.pdf).

[15]    *See* Montgomery Cnty. Council, Agenda Item #5B, Staff Report, April 19, 2022, at page 13-14 of 366 (available at: https://apps.montgomerycountymd.gov/ccllims/DownloadFilePage?FileName=2707_1_20163_B ill_16-21_Action_20220419.pdf).

[16]    *See* **Exhibit 9,** Montgomery Cnty. Council, Agenda Item #9A, Staff Report, May 4, 2021, at 2-24, 27-30.

[17]    *See* Ex. 9 at 27.

[18]    *See* Ex. 9 at 29.

[19]    *See* Ex. 9 at 31.

performance requirements, netted annual building energy efficiency improvements of two percent.[20] Commercial buildings in the County still accounted for roughly one quarter of County greenhouse gas emissions, and the County anticipated there would be only one opportunity before 2035 to replace most building equipment at the end of its useful life.[21] Ultimately, the County Executive found that requiring energy performance standards for the commercial building sector would further reduce greenhouse gas emissions.[22]

The Executive noted anticipated economic benefits of building energy performance standards, observing that, "[b]uildings benchmarked in EPA's ENERGY STAR Portfolio Manager tool that earn the ENERGY STAR label also command higher rental rates, benefit from higher sales prices, and see higher occupancy rates—all of which indicate a building that is more economically resilient than non-ENERGY STAR labeled buildings."[23] Other anticipated beneficial impacts of the Bill included providing "flexibility for [building] owners to choose when and how to improve their buildings," "encourage financial stability through lower energy bills," and "create energy-efficiency jobs at every skill level."[24]

After some amendments, the then-nine-member County Council voted unanimously to adopt Bill No. 16-21. The County Executive signed it on May 2, 2022, and it became effective August 1, 2022. As codified, Bill No. 16-21 is Montgomery County Code § 18A, Article 6:

---

[20]     *See* Ex. 9 at 30-31; 41.

[21]     *See* Ex. 9 at 31.

[22]     *See* Ex. 9 at 30.

[23]     *See* Ex. 9 at 31.

[24]     *See* Ex. 9 at 40.

"Building Energy Use Benchmarking and Performance Standards."[25] The County's benchmark law now includes County-owned, commercial, and multifamily residential buildings over 25,000 square feet, and requires them to comply with interim and long-term energy performance standards as promulgated by regulation.[26] There is also a process for properties that cannot reasonably meet the interim or final performance standards by creation of a "building performance improvement plan."[27] The codified objective of the law is to improve the energy performance of additional covered buildings over time through established building energy performance standards, which will reduce greenhouse gas emissions from the building environment and help the County achieve its climate action goal of zero greenhouse gas emissions by 2035.[28]

To implement Bill 16-21, on February 25, 2025, the County finalized and approved Montgomery County Executive Regulation 17-23AM.[29] The Regulation sets performance standards for different building groups, defines how renewable energy is incorporated into the performance metric, and outlines the elements required in building performance improvement plans. Executive Regulation 17-23AM is now codified in the Code of Montgomery County

---

[25]     *See* Exs. 2, 3.

[26]     *See* Montgomery Cnty. Code §§ 18A-39(a)-(e); 18A-42.

[27]     *See id*. § 18A-42B. The law also created a 15-voting member Building Performance Improvement Board to advise DEP on implementation of building energy performance standards. *See id.* §§ 18A-42A, 18A-42C.

[28]     *See id.* § 18A-38(f).

[29]     *See* Exhibit 4. County Code § 18A-42(b) and (d) mandate implementation via Method (2) regulations. Method (2) regulations under County law require publication of a regulation in the Montgomery County Register, with deadlines for public comments, and transmission of the regulation with comments to the County Council. The County Council must then approve or disapprove the regulation within 60 days. If the County Council does not act, the regulation is automatically approved. *See* Montgomery County Code § 2A-15(c), (f).

Regulations ("COMCOR") §§ 18A.43.01.01– 8A.43.01.16.[30]

As enacted, the BEPS Law defines performance standards for building types using the same benchmarking tool, ENERGY STAR Portfolio Manager, and establishes various building type categories as defined in the tool. *See* COMCOR § 18A.43A.01.03. It establishes a list of final performance standards by building type[31] measured in thousand British thermal units ("kBtu") over the gross floor area ("GFA") proportion of each building type within a covered building, as reported in the benchmarking tool. *Id*. at 18A.43A.01.04. The regulation specifies that a covered building's final performance standard will not require a reduction of greater than 30% from the covered building's performance baseline. *Id*. at 18A.43A.01.06(C). Interim standards are set halfway between the covered building's performance baseline and its final performance standard. *Id*. at 18A.43A.01.07. Owners of covered buildings can receive a renewable energy allowance which credits all electricity generated from onsite renewable energy systems, whether used onsite or exported back to the grid. *Id*. at 18A.43A.01.09.

If an owner of a covered building cannot reasonably meet either the interim or final performance standards due to economic infeasibility or other circumstances beyond the owner's control,[32] the regulations have built in flexibility for the owner to submit a proposed building

---

[30]    *See* Ex. 5.

[31]    COMCOR § 18A.43A.01.05 provides a formula to calculate an area-weighted final performance standard for mixed-use covered buildings based on the gross floor area of each property type reported in the benchmarking tool, excluding parking, and each building type's final performance standard.

[32]    COMCOR § 18A.43A.01.11(B) provides a non-exhaustive list describing circumstances outside the owner's control to include "characteristics inherent to the building or the building's operations or may involve timing events in the building's equipment lifecycles, occupancy, or financing[.]"

performance improvement plan.[33] *Id.* at 18A.43A.01.11; 18A.43A.01.12; 18A.43A.01.13. A building that complies with its building performance improvement plan will be deemed in compliance with interim and final performances standards. *See* COMCOR 18A.43A.01.14(A).

Additionally, a covered building owner may obtain a waiver,[34] extension or adjustment to an interim or final performance standard deadline upon submission of a request along with documentation at least 90 days before the deadline for submitting documentation of compliance is due.[35] *Id.* at 18A.43A.01.15. Circumstances that may warrant one of these built-in flexibilities include financial distress, a newly constructed building, a building is to be demolished, historic preservation requirements, and strict compliance with the BEPS standards would be economically infeasible due to circumstances beyond the owner's control. County Code § 18A-42C(b)(1)-(5); COMCOR § 18A.43A.01.15.D.

Despite these built-in flexibilities, on March 27, 2025, Plaintiffs filed a Complaint seeking a declaratory judgment that the EPCA preempts the BEPS Law, and a permanent injunction

---

[33]     A building performance improvement plan which must include (a) operational improvements; (b) low and no-cost energy improvement measures; (c) retro-commissioning or recommissioning of existing equipment that is planned to remain in service past the final performance standard deadline; and (d) replacement of existing equipment that is planned to be replaced before the final performance standard deadline. *See* COMCOR § 18A.43A.01.12.

Plaintiffs baldly allege that "references to retro-commissioning or replacement of equipment indicate that the County will use building performance improvement plans as a method to force the abandonment of gas equipment and appliances[.]" *See* ECF No. 1 ¶ 33. There is no requirement to abandon gas equipment and appliances in the BEPS Law. Further, as discussed *infra* at 23-24 and at 24 n.44, several buildings in the County achieved projected compliance with interim and final performance standards while still using natural gas to power the building.

[34]     Montgomery County Code § 18A-39(g) states that for any time period for which the owner of a covered building documents, in a form required by regulation, any of the specifically enumerated conditions described in subsection (g), the Director may waive the benchmarking requirements.

[35]     Montgomery County Code § 18A-42(d) provides the interim and final performance standards deadlines based on building type.

10

enjoining its enforcement. Plaintiffs generally allege that the BEPS Law is preempted by the EPCA because it concerns the "energy use" and "energy efficiency" of EPCA-covered gas appliances. *See* ECF No. 1 ¶ 65. Plaintiffs allege specifically that "all EPCA-covered gas appliances increase the kBtu a building uses," therefore the BEPS Law regulates EPCA-covered appliances by "imposing declining kBtu per gross floor area requirements—and associated penalties if the applicable kBtu reductions are not met." *See* ECF No. 1 ¶ 29. Plaintiffs further allege that the built-in flexibilities provided in the BEPS Law "contemplates forcing covered buildings to no longer use EPCA-covered gas appliances as well, or at the very least, penalizes the use of EPCA-covered gas appliances[.]" *Id.* ¶ 36.

Plaintiffs' legal theories and conclusory statements about the BEPS Law in their Complaint are incorrect. Because the BEPS Law does not regulate the "energy use" or "energy efficiency" of EPCA-covered appliances, it falls outside the scope of the EPCA.

Plaintiffs Complaint should be dismissed for failure to state a claim. Alternatively, this Court should grant summary judgment to the County.

## III.    LEGAL STANDARD

### A.    Dismissal Under Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), a court may dismiss a complaint when the allegations of fact do not properly state a claim on which relief can be granted. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Further, the "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* A plaintiff has the burden of pleading "more than a sheer possibility that a defendant acted unlawfully," and to meet that

11

burden, must make more than "naked assertions of wrongdoing" without any "factual enhancement." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citations and internal quotations omitted).

In determining whether to dismiss a complaint pursuant to Rule 12(b)(6), the court must consider the well-pleaded material allegations in the light most favorable to the plaintiff and accept those factual allegations as true. *Flood v. New Hanover County*, 125 F.3d 249, 251 (4th Cir. 1997) (citing *Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 217-18 (4th Cir. 1994)). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citing *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981)). Nor is the court bound to accept a plaintiff's legal conclusions based on the facts alleged, *see District 28, United Mine Workers of America, Inc. v. Wellmore Coal Corp*., 609 F.2d 1083, 1085-86 (4th Cir. 1979), conclusory allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citation omitted). Under the foregoing standards, Defendant is entitled to dismissal with prejudice of Plaintiff's Amended Complaint.

**B.    Summary Judgment Under Rule 56(a)**

Federal Rule of Civil Procedure 12(d) allows the Court to treat a Motion to Dismiss filed under Rule 12(b)(6) or 12(c) as a Motion for Summary Judgment when "matters outside the pleadings are presented to and not excluded by the court." Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  This provision has been described as "an integral part" of the Federal Rules which is "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), quoting Fed.

R. Civ. P. 1. The moving party can establish undisputed facts by citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . , admissions, interrogatory answers, or other materials. . . ." Fed. R. Civ. P. 56 (c)(1)(A). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252. Moreover, wholly speculative assertions will not suffice. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985); *overruled on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

In response to a motion summary judgment, "[t]he nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. At the summary judgment stage, "[t]he nonmoving party  . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). In accordance with this standard, Montgomery County, Maryland is entitled to summary judgment as a matter of law.

## IV.    ARGUMENTS

### A.    Plaintiffs Fail to State a Claim for Which Relief can be Granted Because Defendant's Bill Is Not Preempted By Federal Law.

The EPCA does not preempt the BEPS Law as the BEPS Law regulates overall building energy performance and does not impact appliance "energy use" and "energy efficiency" as defined by the EPCA.

**1. Federal Preemption Analysis Focuses on Congressional Intent.**

Under the Supremacy Clause of the U.S. Constitution, federal law is the "supreme Law of the Land." U.S. Const. art. IV, cl. 2. A court's Supremacy Clause analysis "[s]tarts with the basic assumption that Congress did not intend to displace state law." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 661 (4th Cir. 2024) (quotation omitted). "This presumption makes the most sense when … Congress legislates in a field which the States have traditionally occupied." *See id.* (citation and quotation omitted). The County's BEPS Law, enacted for the purposes of public health and safety because of the threats posed by climate change and global warming, falls squarely within traditional police powers reserved for state and local governments. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985).

This assumption may be overcome in three ways.[36] First, Congress may expressly preempt certain state laws. Second, "'federal law may so thoroughly occupy a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Guthrie v. PHH Mortgage Corp*., 79 F.4th 328, 336 (4th Cir. 2023) (quoting *S. Blasting Servs*., 288 F.3d 584, 590 (4th Cir. 2002) (brackets omitted)). Third, conflict preemption occurs "'when compliance with both federal and state regulations is a physical impossibility[.]'" *S. Blasting Servs*., 288 F.3d at 590 (quoting *Hillsborough Cnty. v. Automated Med. Labs., Inc*., 471 U.S. 707, 713 (1985)). Or a local law may "'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" creating another circumstance in which the Supreme Court has found preemption warranted. *Hillsborough*, 471 U.S. at 713 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

---

[36]     For the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws. *See S. Blasting Servs., Inc. v. Wilkes Cnty., NC*, 288 F.3d 584, 589 (4th Cir. 2002).

It is Congress' purpose that is the "ultimate touchstone" of the preemption analysis. *Washington Gas Light Co. v. Prince George's County Council*, 711 F.3d 412, 419 (2013) (citation omitted). To determine Congress' purpose, "the text of a law controls over purported legislative intentions unmoored from any statutory text," and courts "may not replace the actual text with speculation as to Congress' intent." *Just Puppies, Inc.*, 123 F.4th at 661.

## 2. The Plain Language of the EPCA Demonstrates that the BEPS Law Falls Outside the Scope of EPCA's Express Preemption Provision.

When EPCA's key terms are read in the context of the statute, and technical terms are given their defined meaning as written in the statute, the BEPS Law, which limits greenhouse gas emissions from buildings, does not fall within the preemption provision of the EPCA, which prohibits regulation of "energy use" and "energy efficiency" of consumer appliances and industrial equipment.

The preemption provisions invoked by Plaintiffs provide that the EPCA's appliance energy conservation program preempts a state regulation "concerning the energy efficiency, energy use, or water use" of a covered product[37] with a federal energy conservation standard in effect. 42

---

[37]    The term "covered product" means a consumer product specified in 42 U.S.C. § 6292. *See* 42 U.S.C. 6291(2). Those products are listed as: refrigerators, air conditioners, water heaters, furnaces, dishwashers, clothes washers, clothes dryers, direct heating equipment, kitchen ranges and ovens, pool heaters, television sets, fluorescent lamp ballasts, certain lamps, showerheads, faucets, "water closets," urinals, and any other product classified by the Secretary of the Department of Energy as such. *See* 42 U.S.C. 6292(a).

15

U.S.C. §§ 6297(c) (consumer), 6316(b)(2)(A) (industrial).[38]

The EPCA defines both "energy efficiency" and "energy use," and those definitions must govern. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (a statute must be read "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole"); *Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) (when a statute addresses a technical subject, like the EPCA does, words should not be given their ordinary meaning; rather "a specialized meaning is to be expected") (citation omitted). The EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, *determined in accordance with test procedures*[.]" 42 U.S.C. § 6291(4) (emphasis added). "Energy efficiency" is defined as the "ratio of the useful output of services from a consumer product to the energy use of such product, *determined in accordance with test procedures*[.]" 42 U.S.C. § 6291(5) (emphasis added).[39] Specific test procedures are defined by another section of the statute. *See* 42 U.S.C. § 6293(a)(3) (detailing the process for the testing procedures which are "designed to produce test results which measure energy efficiency, [and] energy use" for EPCA-covered products).

---

[38]    The EPCA addresses consumer and industrial appliances in separate statutory provisions, but the preemptive clause text is substantially similar. *See* 42 U.S.C. § 6297(c)("on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, *no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective* with respect to such product) (emphasis added)); 42 U.S.C. § 6316(b)(2)(A) ("A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, *supersede any State or local regulation concerning the energy efficiency or energy use of a product* for which a standard is prescribed or established pursuant to such section.") (emphasis added).

[39]    These definitions are comparable for the EPCA provisions that govern industrial equipment. *See* 42 U.S.C. §§ 6311(3), (4). As discussed below, Plaintiffs' Complaint and legal analysis omit the italicized portions of these definitions.

The U.S. Department of Energy ("DOE") must prescribe testing procedures for manufacturers to test their products and equipment in order to meet the required energy use and energy efficiency standards. *See, e.g.*, 42 U.S.C. § 6295; 10 C.F.R. §§ 429.12, 429.13, 431.64. Based on the appliance's use and efficiency performance *during the testing procedures*, the manufacturer can certify to the DOE that the product meets the required energy conservation standard. *See* 42 U.S.C. §§ 6293, 6314; 10 C.F.R. § 429.12. The manufacturer then attaches a label to the appliance which conveys the energy use and efficiency information required by applicable regulations, as well as other required information. *See* 42 U.S.C. §§ 6294(c)(8); 6315; *see also* 16 C.F.R. § 305.8. The product's energy use and energy efficiency information can simply fill in the blanks on a standardized label, which is attached before the product enters the stream of commerce. *See generally* 42 U.S.C. § 6294; *see, e.g.*, 16 C.F.R. § 305.16(a)(9) (requiring labels for dishwashers to state: "Estimated energy cost is based on four wash loads a week, and a national average electricity cost of [____] cents per kWh and natural gas cost of $[____] per therm."). Manufacturers are restricted from making any representations with respect to the energy use or efficiency of an appliance unless the product has been tested in accordance with the prescribed testing procedures and such representation "fairly discloses the results of such testing." 42 U.S.C. § 6293(c).

This clearly shows that "energy use" and "energy efficiency" are not changing metrics based on how often or in what manner a consumer or building owner might use a covered appliance or equipment. Rather, these terms describe a "predetermined fixed value" established through specific testing procedures that "measures the characteristics of a covered product as manufactured." *Ass'n of Contracting Plumbers of the City of New York, Inc., et al., v. City of New York*, No. 23-cv-11292, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025).

Here, the EPCA does not preempt or even implicate the BEPS Law. The BEPS Law does not address and has no impact on the quantity of energy consumed by an appliance or the ratio of an appliance's output to its energy use under EPCA testing procedures. Instead, the BEPS Law aims to reduce greenhouse gas emissions by adopting efficiency standards for covered buildings irrespective of any EPCA-covered appliances in use within the building. The BEPS Law does not challenge or concern the EPCA's exclusive authority to set energy conservation standards for covered appliances because objective limits to a covered building's overall greenhouse gas emission operate separately and apart from the predetermined energy conservation standard of an appliance. To that end, there is not a single allegation in the Compliant that any appliance manufacturer had to alter their designs because of the BEPS Laws.

In their Complaint, Plaintiffs advance a flawed legal analysis of the EPCA's preemption provision as their analysis omits half of the definitions of "energy use" and "energy efficiency." *See* ECF No. 1 ¶ 58; *id.* ¶ 62. Specifically, Plaintiffs state "energy use" means "the quantity of energy directly consumed by a consumer product at point of use" for consumer products. ECF No. 1 ¶ 58. But the full definition states: "The term 'energy use' means the quantity of energy directly consumed by a consumer product at point of use *determined in accordance with test procedures under section 6293 of this title.*" 42 U.S.C. § 6291(4) (emphasis added). Likewise, Plaintiffs omit half of the definition of "energy efficiency": they allege, "Energy efficiency' is defined as 'the ratio of the useful output of services from a consumer product to the energy use of such product . . .'" ECF No. 1 at 20 ¶ 58. But the full definition of "energy efficiency" in the EPCA states, "The term energy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product**,** *determined in accordance with test procedures under section*

*6293 of this title."* 42 U.S.C. § 6291(5) (emphasis added).[40]

These omissions are fatal to Plaintiffs' subsequent analysis as it contravenes the requirement that courts give full effect to "every provision and every word in a statute." *Discover Bank v. Vaden*, 396 F.3d 366, 369 (4th Cir. 2005). Giving full effect to the complete definition, "energy use" and "energy efficiency" focus on the quantity or ratio of energy used by a consumer product as determined under EPCA test procedures, which must occur before the consumer product is placed into the stream of commerce. Plaintiffs' allegation that the BEPS Law concerns "energy use" and "energy efficiency" has no factual support at all in their Complaint; they fail to allege how the BEPS Law concerns appliance energy performance measured before the appliance is even sold.

Plaintiffs fail to allege any specific facts to show how the BEPS Law regulates "energy use" or "energy efficiency" of covered products based on the explicit definition of those terms as described above. The only facts Plaintiffs reasonably articulate are that *buildings* will be affected by the BEPS Law,[41] but that cannot sensibly lead to Plaintiffs' conclusory contention that the BEPS Law concerns the energy use and efficiency of EPCA-covered gas appliances. The BEPS

---

[40]    The definitions for "energy use" and "energy efficiency" quoted in Paragraph 62 of the Complaint, ECF No. 1, applicable to the portions of the EPCA that regulate industrial appliances, similarly omit the second half of those definitions, that they values are "determined in accordance with test procedures under section 6314 of this title." *See* 42 U.S.C. § 6311(3), (4).

[41]    Plaintiffs allege that "[s]ince all EPCA-covered gas appliances increase the kBtu a *building* uses, the [BEPS Law regulates] their energy use and energy efficiency by imposing declining kBtu per gross floor area requirements"; "[t]he site energy use intensity (EUI) final performance standards use the 'Zero Net Carbon (ZNC) Methodology,' a target-setting approach that aligns with the County's climate goals and ultimately will require energy efficiency and efficient electrification in most *building* types"; "[t]he ZNC target would force nearly complete electrification of *buildings* subject to the BEPS policy" and "for some *buildings* the costs and level of effort…would be significant"; and the BEPS Law "contemplates forcing covered *buildings* to no longer use EPCA-covered gas appliances[.]"  Complaint at ¶¶ 30, 31, 36 (emphasis added).

Law requires *buildings* to achieve specific emissions standards.  It does not establish energy conservation standards for covered products within or without of those buildings. The BEPS Law clearly falls outside the scope of the EPCA's preemption provision.

### 3. The Legislative History of the EPCA's Express Preemption Provision Demonstrates that the BEPS Law Falls Outside Its Scope

While this Court's analysis may end following review of the plain text of the EPCA, a review of the EPCA's legislative history similarly supports the conclusion that the EPCA does not preempt the BEPS Law.

Congress first enacted EPCA in 1975 and required manufacturers to label their appliances with measures of energy use and efficiency. *See* H.R. Rep. No. 94-340, at 17 (1975), as reprinted in 1975 U.S.C.C.A.N. 1762, 1779. Congress went further and established a nationwide conservation program for appliances which required the DOE to prescribe minimum energy efficiency standards for certain covered products. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362 n.1 (D.C. Cir. 1985). When the DOE did not follow through, manufacturer trade associations became frustrated by the patchwork of state regulations and negotiated with the Natural Resources Defense Council to create uniform national standards. S. Rep. No. 100-6, at 4 (1987), reprinted in 1987 U.S.C.C.A.N. 52, 54–55. Congress amended the EPCA to include the negotiated standards and added the preemption provision. 42 U.S.C. § 6297(c); *see also Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) (holding the legislative history of the EPCA demonstrates that "Congress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements").

The BEPS Law does not deviate from or alter the uniform national appliance efficiency standards, testing procedures, or consumer labeling requirements. The preemption provisions of

the EPCA are clearly intended to protect appliance manufacturers by eliminating the possibility of States creating differing "patchwork" regulations as opposed to one uniform standard for compliance. Strikingly, there are no appliance manufacturers joining Plaintiffs in the lawsuit at hand.

Whether a building owner uses a particular covered product or not, be it electric or gas, to meet a BEPS Law building performance standard does not affect the covered product's EPCA appliance efficiency standard. Because there is no danger of creating a patchwork of differing regulations, the BEPS Law clearly does not fall within the scope of the EPCA preemption provision.

### 4. The BEPS Law does not Conflict with the EPCA Because it Does not Frustrate Compliance with the EPCA or Congressional Purposes.

Nothing in the BEPS Law impacts the federal energy efficiency standards for appliances. The BEPS Law does not dictate efficiency standards for appliances, and manufacturers will not face competing efficiency standards. Congress sought to eliminate competing efficiency standards with the EPCA preemption provisions at issue here. That Congressional purpose and intent will still be honored if the BEPS Law – whose purpose is to reduce greenhouse gas emissions in the County – remains in effect.

Plaintiffs admit the EPCA has roots in the fuel energy crisis of the mid-1970s triggered by our nation's reliance on foreign oil. *See* Complaint at ¶ 39 (the EPCA was "first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources"). In contrast, the County enacted the BEPS Law to reduce greenhouse gas emissions, generated from use of some of those fossil fuels. When the EPCA was enacted and subsequently amended, "the study of climate change was in its infancy." *Massachusetts v. E.P.A.*, 549 U.S. 497, 507 (2007).

Steps Congress has taken over the last two decades to address climate change and greenhouse gas emissions have been unrelated to the EPCA. *Id*. at 507-513 (recounting history).

Plaintiffs' contention that by setting appliance efficiency standards to reduce domestic energy consumption means that Congress intended to preempt State and local regulation of greenhouse gas emissions rings hollow and is not supported by the plain text of the law or any of its legislative history.[42]

### 5. Plaintiffs' Reliance on *Berkeley* is Misplaced

Plaintiffs rely on *California Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094 (9th Cir. 2024), a recent non-binding decision from the Ninth Circuit. Because *Berkeley* is both factually inapplicable to the instant case and was decided in error, this Court should disregard Plaintiffs' argument in reliance on that case and decline to adopt the Ninth Circuit's interpretation of the EPCA's preemption provision.

In *Berkeley*, the court found that the City of Berkeley's building code that prohibited natural gas connections in newly constructed buildings was preempted by the EPCA. Berkeley Mun. Code § 12.80.040(A). The court determined that the building code "concerned energy use"

---

[42] On January 13, 2025, four of the Plaintiffs in this case joined others to file suit against the State of Maryland in a practically indistinguishable Complaint alleging that EPCA preempts the State's building efficiency performance standard law. *See Maryland Building Industry Ass'n, Inc., et al. v. McIlwain,* Case No. 8:25-CV-00113-DLB (D. Md.). The State moved to dismiss the Complaint, contending that EPCA's preemption clause does not apply to the State BEPS Law because the EPCA was never intended to foreclose state regulation of environmental pollution. *See id.* Doc. No. 23-1 at 19 ("[i]t is unreasonable to assume that Congress intended the sole authority to regulate greenhouse gas emissions from buildings to be couched in regulation of energy conservation standards for appliances").

Further, four plaintiffs in this case joined others to sue the County to challenge the County's yet-to-be promulgated requirements for natural gas restrictions in new construction in the County. That case similarly alleges the EPCA preempts the County's to-be-issued regulations implementing that law. *See Nat'l Ass'n of Home Builders of the United States, et al. v. Montgomery Cnty., Md.*, Case No. 8:24-CV-03024-PX (D. Md.).

because it prohibited consumers from being able to use their natural gas-powered appliances, but limited its decision by concluding specifically "that EPCA applies to *building codes* and that Berkeley's Ordinance falls with[in] the Act's preemptive scope." 89 F.4th at 1101 (emphasis added).

Unlike *Berkeley*, the instant case does not involve a building code, and Plaintiffs have proffered no facts to show that the BEPS Law is a building code. Moreover, unlike the natural gas restriction in *Berkeley*, the BEPS Law does not hinder building owners from continuing to use natural gas appliances. Building owners can continue to use their preferred appliances and can still comply with the BEPS Law with waivers, extensions, adjustments, and performance improvement plans based on each building owner's particular circumstance.[43] *See supra*. Building owners can also install new or retro-commission or recommission building systems, through installation of: LED lighting; ENERGY STAR certified electric equipment; weatherization improvements; and control systems for plug loads, lighting, and HVAC equipment to reduce site energy use intensity. In fact, many building owners in the County have already benchmarked their buildings *with natural gas still in use*, and show projected compliance with the interim and final performance

---

[43]     Plaintiffs acknowledge that there are alternative compliance pathways available to them. *See* Complaint at ¶ 32. Plaintiffs mischaracterize these built-in flexibilities as a penalty for using gas appliances "by requiring building owners to take additional measures to reduce site energy use intensity if a building wishes to continue to rely on such appliances." *Id.* at ¶ 36.  Requiring a building owner to take additional measures to comply with a regulation is not the same as a penalty. Alternative compliance measures are opportunities for building owners to ensure adherence to the regulation in the way that most benefits them; penalties are consequences for non-compliance.

standards.[44]

And also unlike *Berkeley*, nothing in the BEPS Law even requires a building owner to indicate what type of appliance is in use – gas or electric – when performing energy benchmarking. The BEPS Law's only concern is the amount of energy used at the building.

Because the facts of *Berkeley*, involving a natural gas restriction in construction via a building code, are inapposite, Plaintiffs' reliance on *Berkeley* is misplaced.

The legal reasoning in *Berkeley* is also inapplicable here because it is fatally flawed. The court there reached its conclusion by adopting a definition of "energy use" that is inconsistent with the definition as written in the EPCA, holding that "energy use" is measured "not only from where the products roll off the factory floor, but also from where consumers *use* the products." 89 F. 4th at 1103 (emphasis in original). This is in complete contravention of the stated definition in the statute. *See* 42 U.S.C. § 6291(4). "Energy use" loses its intended meaning when divorced from the rest of the statutory definition found in the latter part of the clause, *i.e.*, "as *determined in accordance with test procedures* under section 6293 of this title." *Id.* (emphasis added). The Ninth Circuit erred by using an incomplete definition of "energy use." *See United States, ex rel. Polansky v. Executive Health Resources, Inc*., 599 U.S. 419, 432 (2023) (noting the interpretive principle

---

[44]     *See* **Exhibit 10**, printout of https://target-finder.mcbeps.org/details/03760813 (hospital projected to be in compliance with BEPS Law interim and final performance standards as of April 18, 2025, and showing natural gas in use); **Exhibit 11**, printout of https://target-finder.mcbeps.org/details/02216673 (office building projected to be in compliance with BEPS LAW interim and final performance standards as of June 2, 2025, and showing natural gas in use); **Exhibit 12**, printout of https://target-finder.mcbeps.org/details/C001004 (condominium building projected to be in compliance with BEPS Law interim and final performance standards as of May 5, 2025, and showing natural gas in use); **Exhibit 13**, printout of https://target-finder.mcbeps.org/details/03752744 (apartment building project to be in compliance with BEPS Law interim and final performance standards as of May 15, 2025, and showing natural gas in use).
    This information is in a publicly available database - https://target-finder.mcbeps.org/ - which DEP publishes here:
 https://www.montgomerycountymd.gov/DEP/energy/commercial/beps.html.

that "every clause and word of a statute" should have meaning (citation omitted)); *Corning Glass Works v. Brennan,* 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, it [is] proper to explain them by reference to the art or science to which they [are] appropriate" (internal quotation omitted)).

The Ninth Circuit's definition of "energy use" cannot be correct because it relies on an absurd assumption that when enacting the EPCA's appliance efficiency standards, Congress intended for uniform, national standards to turn on the whim of any one consumer's actual use of a covered appliance. "Energy use" cannot depend on a consumer's actual use of a covered appliance when a consumer may leave an appliance uninstalled and unused. "The fact that some consumer might do so does not mean that the appliance's label should list 'zero' as its energy use." *Berkeley*, 89 F.4th at 1122 (Friedland, J., dissenting). Rather, a covered appliance that "sits uninstalled and unused has the same 'energy use' under EPCA as one that is installed and running." *Id*. This must be the case because covered appliances must be certified for compliance and labeled prior to being sold, *see* 10 C.F.R. § 429.12, and such certification and labeling would become impossible if "energy use" could not be known until the product was actually in use. *See Ass'n of Contracting Plumbers*, 2025 WL 843619 at * 5. The Ninth Circuit's interpretation of "energy use" cannot be correct when it would lead to such absurd consequences. *See Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 789, n. 4 (2020) (longstanding canon of statutory interpretation tells courts to "avoid construing a statute in a way that would lead to absurd consequences").

Upon the City of Berkeley's petition for rehearing en banc, ten judges joined in a written dissent from the denial of the en banc hearing. Specifically, Judge Friedland wrote "[i]n nearly a decade on the bench, I have never previously written or joined a dissent from a denial of rehearing en banc. I feel compelled to do so now to urge any future court that interprets the Energy Policy

and Conservation Act not to repeat the panel opinion's mistakes." *Berkeley*, 89 F.4th at 1119 (Friedland, J., dissenting) (footnote omitted). The United States District Court for the Southern District of New York recently followed Judge Friedland's advice when it rejected a preemption lawsuit based on *Berkeley's* reasoning, finding that the EPCA did not preempt a local law prohibiting the use of natural gas in newly constructed buildings. See *Ass'n of Contracting Plumbers*, 2025 WL 843619 at *5 (declining to adopt the interpretation of "energy use" employed by the Ninth Circuit). This Court should likewise reject *Berkeley's* analysis which would extend the EPCA's preemption clause beyond its intended scope.

For these reasons, Plaintiffs' reliance on *Berkeley* is misplaced and this Court should decline to expand the EPCA's preemption provision.

**B.      Plaintiffs Are Not Entitled to Attorney's Fees and Costs.**

Generally, "the prevailing party in a suit is not entitled to recover reasonable attorneys fees and costs from the losing party." *Brat v. Personhuballah*, 883 F.3d 475, 480 (4th Cir. 2018); *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). "Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010).

Congress may carve out exceptions to the general rule, *see* 42 U.S.C.A. § 1988(b), however there is no such carve out available for a federal preemption claim under the EPCA. *See City Of Charleston, S.C. v. A Fisherman's Best, Inc.*, 310 F.3d 155, 178 n.5 (4th Cir. 2002) ("the federal preemption of local ordinances pursuant to the Supremacy Clause is not actionable under 42 U.S.C. § 1983, therefore that section does not support an award of attorney's fees under § 1998.").

## V.    CONCLUSION

For these reasons, Plaintiffs fail to establish facts to support a claim of preemption as a matter of law, and Defendant, Montgomery County, Maryland, requests that this Court grant its Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment, dismiss the claims with prejudice or enter summary judgment in its favor, and grant such other relief as this Court deems proper.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

_____/s/_____
Erin J. Ashbarry
Chief, Division of Government Operations
Federal Bar No. 26298
erin.ashbarry@montgomerycountymd.gov

_____/s/_____
Kristen J. Nunley
Assistant County Attorney
Federal Bar No. 30964
kristen.nunley@montgomerycountymd.gov

_____/s/_____
Jacquelyn P. Allen
Assistant County Attorney
Federal Bar No. 13460
jacquelyn.allen@montgomerycountymd.gov

Attorneys for Defendant
101 Monroe Street, Third Floor
Rockville, Maryland 20850
240-777-6700
240-777-6705 (Fax)