**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE ELIZABETH CONDOMINIUM ASSOCIATION, INC, *et al.*, | ) ) ) | Case No. 8:25-CV-01019-DLB |
| Plaintiffs, | ) ) | |
| v. | ) ) | ***AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT*** |
| MONTGOMERY COUNTY, MARYLAND | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

\*No party's counsel authored the attached *amicus curiae* brief in whole or in part, and no party or its counsel contributed money to fund the preparation or submission of the attached *amicus curiae* brief. *See* L.R. 105.12(b).

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT OF INTEREST......................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 3

ARGUMENT .................................................................................................................... 5

    I.     Buildings Emit Harmful Pollutants with Known Public Health Threats that Degrade Air Quality................................................................................................................... 5

    II.    Building Emissions Cause Harmful Climate Pollution, in Contravention of Local and State Law. ....................................................................................................... 10

    III.   Regulating Air Pollution from Buildings Falls Squarely Within the County's Authority. ................................................................................................................ 12

CONCLUSION................................................................................................................ 14

## TABLE OF AUTHORITIES

**Cases**

*Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*,
    519 U.S. 316 (2010)…………………..…………………………………………………12

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982)…………………………………………………………………13

*Rowe v. New Hampshire Motor Transp. Ass'n*,
    552 U.S. 364 (2008)........................................................................................ 13

*Ass'n of Contracting Plumbers v. City of New York*
    2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) ...................................................... 13

*Lara-Aguilar v. Sessions*, 889 F.3d 134
    (4th Cir. 2018)............................................................................................... 13

*Metro Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010)............................................................................ 11

*Star Scientific Inc. v. Beales*,
    278 F.3d 339 (4th Cir. 2002)…………………………………………………………11

*Troll Co. v. Uneeda Doll Co.*,
    483 F.3d 150 (2d Cir. 2007)…..……………………………………………………..13

**Statutes and Regulations**

Md. Code Ann., Env't. §§ 2–1204.1, 2–1204.2………………………………………………10

Md. COMAR 26.28. 03……………………………………………………………….....10

Md. COMAR 26.28. 04……………………………………………………………………11

**Federal Register**

California State Implementation Plan Revisions,
    47 Fed. Reg. 29,231 (Jan. 7, 1986) ...................................................................... 12

Clean Air Fine Particle Implementation Rule,
    72 Fed. Reg. 20,586 (Apr. 25, 2007) ...................................................................... 5

Energy Conservation Program: Energy Conservation Standards for Residential Refrigerators,
    Refrigerator-Freezers, and Freezers,
    75 Fed. Reg. 59,470 (Sept. 27, 2010) ...................................................................... 12

Energy Conservation Program: Energy Conservation Standards for Residential Water Heaters, Direct Heating Equipment, and Pool Heaters, 75 Fed. Reg. 20,112 (Apr. 16, 2010). .................................................................................... 13

Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces, 47 Fed. Reg. 14,424 (Apr. 2, 1982). ....................... 12

National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652 (July 18, 1997) ............................................................................... 5

National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,144 (Oct. 17, 2006) ............................................................................... 5

National Primary and Secondary Ambient Air Quality Standards, 36 Fed. Reg.  (Apr. 30, 1971) .......................................................................................... 4

Prevention of Significant Deterioration (PSD) for Particulate Matter Less Than 2.5 Micrometers ($PM_{2.5}$)—Increments, Significant Impact Levels (SILs) and Significant Monitoring Concentration (SMC), 72 Fed. Reg. 54,112 (Sept. 21, 2007) ..................................................... 5

Primary National Ambient Air Quality Standards for Nitrogen Dioxide, 75 Fed. Reg.  (Feb. 9, 2010) ........................................................................................... 4

**Other Authorities**

Am. Cancer Soc'y, *Benzene and Cancer Risk* ................................................................. 6

Andee Krasner et al., *Cooking with Gas, Household Air Pollution, and Asthma: Little Recognized Risk for Children*, 83 J. Env't Health 8 (2021) ........................................................ 4

Beyond Gas, *Cooking Up Danger: Community Study Reveals Hazardous Nitrogen Dioxide Levels in DC and Maryland Kitchens* (Nov. 2024) ................................................................. 2

CCAN, et al., *Cutting Through the Smog: How Air Quality Standards Help Solve the Hidden Health Toll Of Air Pollution From Maryland's Homes And Businesses* (Sept. 2023). .......... 2, 7

Christopher W. Tessum et al., *PM2.5 Polluters Disproportionately and Systemically Affect People of Color in the United States* ................................................................................ 8

Ctrs. for Disease Control & Prevention, *Carbon Monoxide Poisoning* ............................ 6

Drew R. Michanowicz et al., *Home Is Where the Pipeline Ends: Characterization of Volatile Organic Compounds Present in Natural Gas at the Point of the Residential End User* 56 Env't Sci. & Tech. 10258 (June 2022) ........................................................................................ 4, 6

Eric D. Lebel et al., *Composition, Emissions, and Air Quality Impacts of Hazardous Air Pollutants in Unburned Natural Gas from Residential Stoves in California*, 56 Env't Sci. & Tech. 15828 (Oct. 20, 2022) ..................................................................................................... 4

Jason J. Rose *et al.*, *Carbon Monoxide Poisoning: Pathogenesis, Management, and Future Directions of Therapy*, 195 Am. J. Respiratory & Critical Care Med. 596 (2017) ................... 6

Md. Pub. Serv. Comm'n Case No. 9673 (Complaint of the Office of People's Counsel Against Washington Gas Light Company and WGL Energy Services, Inc.). ......................................... 3

Md. Pub. Serv. Comm'n Case No. 9707 (Petition of the Office of People's Counsel for Near-Term, Priority Actions and Comprehensive, Long-Term Planning For Maryland's Gas Companies). ................................................................................................................ 2, 9

Md. Pub. Serv. Comm'n Case No. 9708 (Washington Gas Light Company's Application for Approval of a New Gas System Strategic Infrastructure Development and Enhancement Plan and Accompanying Cost Recovery Mechanism)........................................................................ 2

State Climate Policy Dashboard, *Greenhouse Gas Emissions Projections in Maryland*............... 9

Sonoma Technology, *Ozone Impacts from Building Combustion Sources on Nonattainment Areas in Maryland* (Sept. 25, 2024)........................................................................................ 2

University of Md. Center for Enviro. Science, *Sea-Level Rise Projections*............................9

U.S. Center for Disease Control, Polycyclic Aromatic Hydrocarbons (PAHs) Fact Sheet (Nov. 2009) ...................................................................................................................... 6

U.S. EPA, *Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards* .............................................................................................................. 7

U.S. EPA, R*egulatory and Guidance Information by Topic: Air*.................................. ...13

U.S. EPA, *Air Quality Design Values*,................................................................................ 8

U.S. EPA, *Basic Information about NO2* .......................................................................... 4

U.S. EPA, *Carbon Monoxide's Impact on Indoor Air Quality*.......................................... 6

U.S. EPA, *Facts About Formaldehyde* ............................................................................ 4

U.S. EPA, *Health and Environmental Effects of Particulate Matter: Health Effects* ................... 5

U.S. EPA, *Integrated Science Assessment for Carbon Monoxide* (Jan. 2010) .................................................................................................... 7

U.S. EPA, *Integrated Science Assessment for Oxides of Nitrogen – Health Criteria*, (Jan. 2016) ...................................................................................................... 5

U.S. EPA, *Integrated Science Assessment for Ozone and Related Photochemical Oxidants* (Feb. 2013) .......................................................................................................... 7, 8

U.S. EPA, *Integrated Science Assessment for Particulate Matter* ES-23 (Dec. 2019) .................. 5

U.S. EPA, *National Emissions Inventory (NEI) Data* .................................................... 7

U.S. EPA, *Ozone National Ambient Air Quality Standards (NAAQS)* ............................................ 8

U.S. EPA, *What are Combustion Products?* ................................................................ 4

U.S. EPA, *What is Ozone?* ................................................................................ 7

**STATEMENT OF INTEREST**

Founded in 1892, Sierra Club is a national grassroots environmental organization with more than 620,000 members nationwide, including over 14,000 members in Maryland, over 4,000 of whom reside in Montgomery County (the "County"). For decades, Sierra Club has supported policies that limit greenhouse gas emissions and promote clean energy. Sierra Club's Building Electrification Campaign endeavors to educate the public about the health harms caused by emissions from buildings and advocates for policies that protect against such harms. Sierra Club submitted testimony in support of the passage of County Bill No. 16-21.

The Chesapeake Climate Action Network ("CCAN") is a grassroots organization dedicated exclusively to fighting for bold and just solutions to climate change in the Chesapeake region of Maryland, Virginia, and Washington, D.C. CCAN's mission is to build a diverse movement powerful enough to put this region on the path to climate stability, while using its proximity to the nation's capital to inspire action in neighboring states, around the country, and across the world. CCAN has more than 35,000 members across Maryland, with more than 11,000 in Montgomery County alone, and was an ardent supporter of the passage of County Bill No. 16-21.

Sierra Club and CCAN have been actively highlighting the public health, outdoor air quality, and climate threats associated with building emissions in Maryland's communities. To combat those harms, CCAN and Sierra Club vigorously supported the passage of the 2022 Climate Solutions Now Act ("CSNA"), including its landmark provision requiring the Maryland Department of the Environment ("MDE") to develop state-wide Building Energy Performance Standards ("BEPS"). Both CCAN and Sierra Club have been active proponents of other Maryland and local legislation and regulations that would require purchases of new electric

heating equipment in homes, require building owners to reduce emissions from fuel combustion in their buildings, and require gas companies to reduce emissions from heating equipment throughout their service territories. Moreover, both Sierra Club and CCAN have issued reports highlighting the public health threats of gas combustion in Maryland, including its significant contribution to outdoor air pollution in the form of nitrogen oxide.[1] In fact, a report co-authored by CCAN in September 2023 found that pollution from fossil fuel equipment in buildings emits significantly more nitrogen oxide than regional power plants.[2]

In Maryland and states including California, Colorado, New York, and Washington, Sierra Club and CCAN have filed *amicus* briefs and/or intervened in support of state and local governments' efforts to exercise their traditional police powers to protect public health and safety by regulating greenhouse gas emissions from buildings. Sierra Club and CCAN have an interest in ensuring that federal law is not misinterpreted to thwart the ability of Maryland and its local communities to safeguard their residents through legitimate exercises of legislative authority.

Sierra Club and CCAN are also engaged in multiple administrative and legislative efforts to reduce Marylanders' exposure to harmful air pollution from buildings. Sierra Club and CCAN have filed comments with the Maryland Public Service Commission in support of long-term planning to reduce reliance on the aging, polluting gas system, and Sierra Club has raised alarms about Plaintiff Washington Gas Light Company's attempts to spend millions of ratepayer dollars

---

[1] *See* Sonoma Technology, *Ozone Impacts from Building Combustion Sources on Nonattainment Areas in Maryland* (Sept. 25, 2024), https://www.sierraclub.org/sites/default/files/2024-11/md_buildingso3_final.pdf; Beyond Gas, *Cooking Up Danger* (Nov. 2024), https://beyondgasdc.org/cooking-up-danger-community-study-reveals-hazardous-nitrogen-dioxide-levels-in-dc-and-maryland-kitchens/.

[2] CCAN, *et al.*, *Cutting Through the Smog: How Air Quality Standards Help Solve the Hidden Health Toll Of Air Pollution From Maryland's Homes And Businesses* at 2 (Sept. 2023), https://www.greenandhealthyhomes.org/wp-content/uploads/MD-NOx-Report-_V12_unembargoed.pdf.

building new gas distribution pipes.[3] Sierra Club also joined the Maryland Office of People's

Counsel in objecting to Plaintiff Washington Gas Light's false statements to customers that

inaccurately portrayed gas usage in homes as a climate-friendly action.[4] On March 20, 2025, the

Public Service Commission's Public Utility Law Judge notably agreed that Washington Gas

Light Company's statements were misleading, and is now considering whether to impose civil

penalties as a sanction.[5] On June 30, 2025, the Public Utility Law Judge ordered a civil penalty

of $350,000 and prohibited Washington Gas Light Company from issuing billing statements that

include marketing messages for a period of five years.[6]

## INTRODUCTION AND SUMMARY OF ARGUMENT

There is an established scientific basis and growing public understanding that emissions

from our homes, schools, and workplaces are making us sick and driving climate change. This

pollution causes serious human health harms, including asthma, chronic obstructive pulmonary

disease, cardiovascular disease, cognitive deficits, cancer, and death. Compared to other sectors,

buildings emissions are an outsized source of greenhouse gases and criteria air pollutants. In

response, states, counties, and municipalities have acted on public concern, and exercised valid

legislative authority to reduce emissions from buildings to abate the health, climate, and air

quality impacts of those emissions.

---

[3] *See* Md. Pub. Serv. Comm'n Case Nos. 9707 (Petition of the Office of People's Counsel for Near-Term, Priority Actions and Comprehensive, Long-Term Planning For Maryland's Gas Companies), & 9708 (Washington Gas Light Company's Application for Approval of a New Gas System Strategic Infrastructure Development and Enhancement Plan and Accompanying Cost Recovery Mechanism).

[4] Md. Pub. Serv. Comm'n Case No. 9673 (Comments of the Sierra Club) (January 7, 2022).

[5] Md. Pub. Serv. Comm'n Case No. 9673 (Complaint of the Office of People's Counsel Against Washington Gas Light Company and WGL Energy Services, Inc.), PULJ Ruling on Washington Gas Light Company's Request for Dismissal and the Maryland Office of People's Counsel's Motion for Summary Judgment (March 20, 2025).

[6] Md. Pub. Serv. Comm'n Case No. 9673 (Complaint of the Office of People's Counsel Against Washington Gas Light Company and WGL Energy Services, Inc.), PULJ Ruling on Washington Gas Light Company's Motion to Strike and Proposed Order on the Imposition of Civil Penalties (June 30, 2025).

In response, the County acted decisively, resolving to reduce greenhouse gas emissions in the County by 80% in 2027, and by 100% in 2035,[7] and has enacted a host of measures to meet those targets.[8] With nearly 50 percent of greenhouse gas emissions in the County generated from buildings,[9] the County passed County Bill 16-21 on May 2, 2022 to expand its existing energy performance standards to reduce emissions from large buildings within the County. The County further approved County Executive Regulation 17-23AM on February 25, 2025 to implement County Bill 16-21, which set "performance standards for different building groups, defines how renewable energy is incorporated into the performance metric, and outlines the elements required in building performance improvement plans."[10] Collectively, County Bill 16-21 and County Executive Regulation 17-23AM form the County BEPS program at issue in this case.

The County BEPS program does not address concern the "energy use" or "energy efficiency" of covered products under the Energy Policy and Conservation Act ("EPCA"). The County BEPS program does not dictate specific energy use standards for a given covered product, nor does it command the use of a particular product. Instead, the County BEPS program acts as a flexible and phased approach to address overall energy intensity for covered buildings of a certain size in an effort to reduce their overall emissions. Plaintiffs' Complaint is merely an attempt to stretch the flawed Ninth Circuit interpretation of EPCA's preemptive reach to invalidate County measures enacted pursuant to valid police powers to protect health and safety of County residents. Accordingly, Defendant's Motion should be granted, and Plaintiffs' Complaint should be dismissed, with prejudice.

---

[7] Def.'s Ex. 1
[8] Def.'s Br. at 5-6.
[9] Metropolitan Washington Council of Governments, *Community-Wide Greenhouse Gas Emissions Summaries, Montgomery County, Maryland* (2022), https://montgomerycountymd.gov/climate/Resources/ Files/climate/ghg/ghg-summary-factsheet.pdf
[10] Def.'s Br. at 8.

**ARGUMENT**

I.    **Buildings Emit Harmful Pollutants with Known Public Health Threats that Degrade Air Quality.**

The primary driver of building emissions is the combustion of fossil gas for a variety of consumer uses. Termed "natural gas" by industry, the blend of chemicals that is piped into homes and other buildings across the country is primarily composed of methane.[11] The chemical byproducts of combusting gas include the greenhouse gas carbon dioxide, as well as nitrogen dioxide,[12] carbon monoxide, particulate matter, and volatile organic compounds such as benzene and formaldehyde.[13] Exposure to these pollutants has been increasingly linked to negative human health effects, including higher rates of respiratory and cardiovascular illnesses, such as childhood asthma, as well as reduced lung function and premature death.[14]

*Nitrogen Dioxide.* The U.S. Environmental Protection Agency ("EPA") has long recognized that nitrogen dioxide, a prevalent pollutant from gas combustion, can cause asthma.[15] Even short-term nitrogen dioxide exposure can cause impaired lung function, respiratory symptoms, inflammation of the airway, and asthma exacerbations requiring hospitalization.[16]

---

[11] Drew R. Michanowicz *et al.*, *Home Is Where the Pipeline Ends: Characterization of Volatile Organic Compounds Present in Natural Gas at the Point of the Residential End User*, 56 Env't Sci. & Tech. 10258, 10258 (June 2022), https://pubs.acs.org/doi/10.1021/acs.est.1c08298 (identifying 296 volatile organic compounds aside from methane in cooking gas samples); Eric D. Lebel et al., *Composition, Emissions, and Air Quality Impacts of Hazardous Air Pollutants in Unburned Natural Gas from Residential Stoves in California*, 56 Env't Sci. & Tech. 15828 (Oct. 20, 2022), https://pubs.acs.org/doi/10.1021/acs.est.2c02581.

[12] "Nitrogen Dioxide (NO2) is one of a group of highly reactive gases known as oxides of nitrogen or nitrogen oxides (NOx). Other nitrogen oxides include nitrous acid and nitric acid. NO2 is used as the indicator for the larger group of nitrogen oxides." U.S. EPA, *Basic Information about NO2*, https://www.epa.gov/no2-pollution/basic-information-about-no2#What%20is%20NO2 (last updated July 10, 2025).

[13] U.S. EPA, *What are combustion products?*, https://www.epa.gov/indoor-air-quality-iaq/what-are-combustion-products (last updated Dec. 4, 2024); U.S. EPA, *Facts About Formaldehyde*, https://www.epa.gov/formaldehyde/facts-about-formaldehyde (last updated July 7, 2025).

[14] Andee Krasner et al., *Cooking with Gas, Household Air Pollution, and Asthma: Little Recognized Risk for Children*, 83 J. Env't Health 8, 14 (2021), https://www.proquest.com/docview/2505418593?sourcetype=Scholarly%20Journals.

[15] National Primary and Secondary Ambient Air Quality Standards, 36 Fed. Reg. 8186 (Apr. 30, 1971).

[16] Primary National Ambient Air Quality Standards for Nitrogen Dioxide, 75 Fed. Reg. 6474, 6479-80 (Feb. 9, 2010).

Exposure to nitrogen dioxide is also linked to chronic obstructive pulmonary disease, cardiovascular effects, diabetes, cancer, and reproductive harms.[17]

   ***Particulate Matter.*** Particulate matter is another form of air pollution generated by gas appliances that poses a unique threat to human health.[18] $PM_{2.5}$, or fine particulate matter, refers to inhalable particles with diameters that are 2.5 micrometers and smaller, and thus easily penetrate the defenses of our lungs.[19] $PM_{2.5}$ is mainly produced by "combustion processes and by atmospheric reactions of various gaseous pollutants."[20] Exposure to $PM_{2.5}$ pollution has been linked to premature death, emergency visits and hospitalizations, heart attacks, strokes, worsening of chronic heart failure, impaired fetal and childhood lung function development, acute and chronic decreases in lung function, respiratory infections, and the development and exacerbation of asthma.[21] Even short-term exposure "is likely causally associated with mortality from cardiopulmonary diseases, increased hospitalization and emergency department visits for cardiopulmonary diseases, increased respiratory symptoms, decreased lung function, and changes in physiological indicators for cardiovascular health."[22] There is no safe level of $PM_{2.5}$ exposure.[23]

---

[17] U.S. EPA, *Integrated Science Assessment For Oxides of Nitrogen – Health Criteria*, 1-17, 1-22 to 1-30, 5-55 (Jan. 2016), https://assessments.epa.gov/isa/document/&deid=310879.

[18] National Ambient Air Quality Standards for Particulate Matter, 62 Fed. Reg. 38,652, 38,653–54 (July 18, 1997).

[19] *Id.* at 38,654.

[20] National Ambient Air Quality Standards for Particulate Matter, 71 Fed. Reg. 61,144, 61,146 (Oct. 17, 2006).

[21] Clean Air Fine Particle Implementation Rule, 72 Fed. Reg. 20,586, 20,586-87 (Apr. 25, 2007). *See also* U.S. EPA, *Health and Environmental Effects of Particulate Matter (PM): Health Effects*, https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last updated May 23, 2025).

[22] Prevention of Significant Deterioration (PSD) for Particulate Matter Less Than 2.5 Micrometers ($PM_{2.5}$)— Increments, Significant Impact Levels (SILs) and Significant Monitoring Concentration (SMC), 72 Fed. Reg. 54,112, 54,128 (Sept. 21, 2007).

[23] U.S. EPA, *Integrated Science Assessment for Particulate Matter,* ES-23 (Dec. 2019), https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=347534.

***Carbon Monoxide.*** According to EPA, homes with gas-burning appliances have higher carbon monoxide levels than those without.[24] Carbon monoxide poisoning results in more than 400 deaths and over 100,000 emergency department visits in the United States annually.[25] As early as 2010, the EPA stated there is likely a causal relationship between short-term carbon monoxide exposure and cardiovascular morbidity.[26]

***Cancer-Causing Compounds.*** In addition to the byproducts of fossil fuel burning that have been understood for decades, newer research indicates that the combustion of gas releases semi-volatile organic compounds known as polycyclic aromatic hydrocarbons or PAHs,[27] as well as volatile organic compounds, such as formaldehyde[28] and benzene.[29] For instance, a 2022 study of Boston's gas supply revealed the presence of 296 volatile organic compounds, including 21 hazardous air pollutants.[30] All of these pollutants are linked to cancer and, thus, no safe level of exposure can be recommended. For instance, long-term exposure to benzene can lead to blood disorders and, according to the American Cancer Society, is linked to higher rates of cancer, including leukemia and other blood cancers. Short-term exposure to benzene can also cause "drowsiness, dizziness, headaches, tremors, confusion, and/or unconsciousness."[31]

---

[24] U.S. EPA, *Carbon Monoxide's Impact on Indoor Air Quality*, *available at* https://www.epa.gov/indoor-air-quality-iaq/carbon-monoxides-impact-indoor-air-quality (last updated Apr. 11, 2025).

[25] U.S. Ctr. for Disease Control, *Carbon Monoxide Poisoning Basics*, https://www.cdc.gov/carbon-monoxide/about/index html (Apr. 17, 2024); *see also* Jason J. Rose et al., *Carbon Monoxide Poisoning: Pathogenesis, Management, and Future Directions of Therapy*, 195 Am. J. Respiratory & Critical Care Med. 596 (2017), https://www.atsjournals.org/doi/full/10.1164/rccm.201606-1275CI.

[26] U.S. EPA, Integrated Science Assessment for Carbon Monoxide, 2-5, (Jan. 2010) https://assessments.epa.gov/isa/document/&deid=218686

[27] U.S. Ctr. for Disease Control, Polycyclic Aromatic Hydrocarbons (PAHs) Fact Sheet (Nov. 2009), https://www.epa.gov/sites/default/files/2014-03/documents/pahs_factsheet_cdc_2013.pdf.

[28] U.S. EPA, *supra* n.13.

[29] Michanowicz *et al.*, *supra* n.11, at 10266.

[30] *Id.* at 10258.

[31] Am. Cancer Soc'y, *Benzene and Cancer Risk*, https://www.cancer.org/cancer/risk-prevention/chemicals/benzene html (last revised Feb. 1, 2023).

Fossil fuel combustion in buildings is also a major source of outdoor air pollution. According to data from EPA's National Emissions Inventory, combusting fossil fuels in buildings releases over 250,000 tons per year of carbon monoxide, over 460,000 tons of nitrogen oxides, and more than 15,000 tons of fine particulate matter nationwide.[32] In Maryland, the nitrogen oxide pollution from fossil fuel combustion in buildings is three times greater than from all of Maryland's fossil fuel power plants combined.[33]

The consequences of these emissions on ambient air quality are significant and harmful. Ground-level ozone is a highly reactive gas that is formed by interactions between nitrogen oxides and volatile organic compounds, which are emitted by gas-burning equipment and other sources, in the presence of heat and sunlight.[34] Multiple areas in Maryland are in nonattainment of EPA's health-based National Ambient Air Quality Standards for ozone, which states are legally responsible for attaining under the Clean Air Act. Ozone exposure, even short-term exposure, is linked to chronic conditions affecting the respiratory, cardiovascular, reproductive, and central nervous systems, as well as premature mortality.[35] Ozone exposure is associated with increased asthma attacks, emergency room visits, hospitalization, and medication for asthma.[36] Protecting against the health harms associated with building emissions was a critical consideration for the County's greenhouse gas emission targets. In support of similar state-wide emissions reductions targets embodied in the CSNA, Sierra Club noted that if adopted across the United States, initiatives like the County BEPS program would help avoid "an estimated 172–

---

[32] U.S. EPA, *2017 National Emissions Inventory (NEI) Data*, https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-data#dataq (last updated May 5, 2025).
[33] CCAN, *et al.,* supra n.2 at 11.
[34] U.S. EPA, *What is Ozone?*, https://www.epa.gov/ozone-pollution-and-your-patients-health/what-ozone# (last updated June 6, 2025).
[35] U.S. EPA, *Integrated Science Assessment for Ozone and Related Photochemical Oxidants* 1-5, Tbl. 1-1 (Feb. 2013), https://ordspub.epa.gov/ords/eims/eimscomm.getfile?p_download_id=511347
[36] U.S. EPA *Policy Assessment for the Review of the Ozone National Ambient Air Quality Standards,* at 3-27 to 3-28 (Aug. 2014), \ https://www3.epa.gov/ttn/naaqs/standards/ozone/data/20140829pa.pdf.

405 premature deaths, 171 hospital admissions, 11,000 asthma exacerbations, 54,000 respiratory

symptoms, 21,000 lost days of work, and 16,000 lost days of school."[37]

While the health impacts of ozone are ubiquitous, certain populations are at an increased

risk for ozone-related health effects, including people with asthma, children, the elderly, and

outdoor workers.[38] As discussed above, multiple areas in Maryland have historically been and

are still currently classified as being in nonattainment of federal ozone standards. In 2024, Sierra

Club released a report on the impact of emissions from Maryland's buildings on ozone levels, in

which modeling revealed that on high ozone days, buildings in Maryland contributed as much as

1.99 parts per billion (ppb) to air quality violations.[39] Reducing emissions from buildings—

through policies such as the County BEPS program—could assist in moving the region from an

air quality level that is unsafe and violates EPA's standards to a safe air quality level.[40]

Fossil fuel equipment also emits nitrogen oxides, which, as described above, contributes

to the formation of deadly fine particulate matter ($PM_{2.5}$). Noting that buildings emit pollution

where Marylanders live and work, the Green and Healthy Homes Initiative provided data in its

testimony in support of the CSNA showing a statistically significant increase in all-cause

mortality linked to increases in local $PM_{2.5}$ emissions.[41] Alarmingly, the health harms due to

these emissions tend to fall disproportionately on people of color, who are exposed to

---

[37] Sierra Club Testimony in support of SB 528 – Climate Solutions Now Act of 2022 (Feb. 15, 2022),
https://www.sierraclub.org/sites/default/files/sce/maryland-chapter/Legislation/SB528%20%20Sierra%20Club%20-
%20FWA.pdf.
[38] U.S. EPA, *supra* n.34 at 2-30.
[39] *See* Sonoma Technology, *supra* note 1.
[40] U.S. EPA, *Ozone National Ambient Air Quality Standards (NAAQS)*, *available at* https://www.epa.gov/ground-
level-ozone-pollution/ozone-national-ambient-air-quality-standards-naaqs; U.S. EPA, *Air Quality Design Values*,
https://www.epa.gov/system/files/documents/20246/o3_designvalues_2021_2023_final_06_04_24.xlsx.
[41] GHHI Testimony in support of SB 528 - Climate Solutions Now Act of 2022 (Feb. 14, 2022),
https://mgaleg.maryland.gov/cmte_testimony/2022/ehe/1sWaXSArKjeZMsVJgqQwV2z87MeGWYwAr.pdf

approximately 90 percent more ambient $PM_{2.5}$ pollution from residential gas combustion nationwide than are whites.[42]

## II.    Building Emissions Cause Harmful Climate Pollution, in Contravention of Local and State Law.

In addition to contributing to harmful ozone pollution and degrading immediate outdoor air quality, buildings are a significant source of greenhouse gas emissions contributing to climate change. This climate pollution impedes the County's ability to comply with its binding emissions reduction targets, and has state-wide, national, and international repercussions, as those emissions worsen the climate crisis. As described above, methane gas combustion in the building sector releases the greenhouse gas carbon dioxide, and methane—an even more potent greenhouse gas—also leaks from gas distribution pipes that supply buildings with this fuel. According to the Metropolitan Washington Council of Government's emissions inventory database, almost 50 percent of the County's total greenhouse gas emissions came from the building sector in 2022, with 25 percent due to the commercial building sector.[43] Montgomery County adopted an ambitious climate policy, resolving to reduce its greenhouse gas emissions by 80% by 2027 and 100% by 2035.[44] In this resolution, the County aptly defines climate change as "an unprecedented global emergency" consisting of drastic global changes, including "mega-droughts, heat waves, super-storms, flash flooding, [and] the migration of mosquito-borne diseases."[45] To combat the climate crisis, the County's 2021 Climate Action Plan details a range of strategies to achieve its climate goals, highlighting the need to deploy a combination of

---

[42] Christopher W. Tessum *et al.*, *PM2.5 Polluters Disproportionately and Systemically Affect People of Color in the United States*, 7 Sci. Advances eabf4491, supplementary data file S2 (2021), https://doi.org/10.1126/sciadv.abf4491
[43] Metropolitan Washington Council of Governments, *supra* note 9.
[44] Montgomery Cnty. Resolution No. 18-974, *Energy Climate Mobilization* (Dec. 5, 2017).
[45] *Id.*

"energy performance standards, legislative and code requirements, and incentives."[46] The County specifically noted that building performance standards—like the County BEPS program—is "appropriate to give building owners the flexibility to achieve the applicable standard in the most cost-effective way possible."[47] Contrary to Plaintiffs' assertions, these regulations do not require or restrict the usage of any types of appliances or equipment in buildings. Instead, building owners can choose from a wide range of measures to reduce their emissions and meet the BEPS emissions targets, including weatherization, electrification, alternative fuels, and carbon capture, among others. As part of a suite of programs, the County BEPS program is critical to meet the County's emissions reduction requirements.

The County BEPS program is also a key part of Maryland's overall efforts to meet state-wide emissions reduction targets by lowering emissions from buildings. Acknowledging the myriad harms posed by climate change, the Maryland General Assembly passed the CSNA to require Maryland to reduce statewide emissions 60% below 2006 levels by 2031 and reach carbon neutrality by 2045.[48] As part of that landmark law, a statewide BEPS program was put forth as a robust strategy to reduce emissions from the buildings sector while providing flexibility for Maryland building owners. Substantially similar to the County BEPS program, it leaves it up to the building owner to decide how to comply with these emission limits. Alternatively, building owners may choose to comply with the BEPS by paying an alternative compliance fee based on the social cost of their emissions in excess of the targets.[49]

---

[46] *Montgomery County Climate Action Plan,* at 95 (June 2021), https://www.montgomerycountymd.gov/climate/Resources/Files/climate/climate-action-plan.pdf.
[47] *Id.* at 130.
[48] MD. CODE ANN., ENVIR. §§ 2–1204.1, 2–1204.2.
[49] Md. COMAR 26.28. 04. The specific components of the BEPS policy may be changing in light of Maryland legislation that just passed. *See* Md. H.B. 49 (2025).  Nothing in the legislation would change the fundamentals of the BEPS.

The County BEPS program is a measured and calibrated tool to broadly address greenhouse gas emissions from buildings—it is the product of careful deliberation and is aimed at meeting the County's emission and climate mandates.

### III.    Regulating Air Pollution from Buildings Falls Squarely Within the County's Authority.

The County BEPS program is not preempted by EPCA. EPCA is chiefly concerned with setting energy efficiency standards for appliances; to the contrary, the County BEPS program is aimed at reducing emissions from buildings. These regulations neither establish, reference, rely upon, nor are connected to any "energy efficiency" or "energy use" standards for any covered appliances, as those terms are defined under EPCA. *Metro Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156-57 (2d Cir. 2010) (citing *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (2010)) (stating that a law is preempted when a preempted subject matter is referenced or essential to the law's operation).

The County BEPS program is a valid exercise of the County's power to promulgate regulations that protect its residents' public health and safety. The U.S. Court of Appeals for the Fourth Circuit has explained that states and localities clearly have the "police power to promote the public health, safety, welfare, and morals[.]" *Star Scientific Inc. v. Beales*, 278 F.3d 339, 361 (4th Cir. 2002) (upholding Virginia's right to exact damages from tobacco manufacturers as compensation for the harms cigarettes caused to Virginia residents). As set forth above, by reducing air pollution from buildings, the County BEPS will provide critical public health protections and therefore fall squarely within the County's power. Plaintiffs' overbroad reading of EPCA would hamstring the traditional ability of States and localities to protect their residents from harmful pollution—an important element of their police power that is far removed from regulating appliances' energy efficiency, and one which Congress did not intend to disturb in

enacting EPCA. *See, e.g.*, 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010) (U.S. Department of Energy explaining that it "interprets 'regulation concerning energy use'" in EPCA's preemption provision "to be equivalent to an 'energy conservation standard'"); 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982) (U.S. Department of Energy proposing to review waivers of preemption only for "State regulations that are appliance *efficiency* standards," because "[a state] rule whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product").

Moreover, Plaintiffs' expansive reading of EPCA's preemptive scope would run contrary to other Congressional enactments that have carefully preserved states' and localities' traditional authority to address outdoor air pollution, including emissions from combustion appliances. *See, e.g.*, 42 U.S.C. § 7401 (finding that "air pollution control at its source is the primary responsibility of States and local governments"); 42 U.S.C. § 7416 (preserving the "right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution"); 47 Fed. Reg. 29,231 (Jan. 7, 1986) (U.S. Environmental Protection Agency approving local emission standards for furnaces into California's Clean Air Act State Implementation Plan); 75 Fed. Reg. 20,112, 20,133 (Apr. 16, 2010) (U.S. Department of Energy recognizing that local emission standards for water heaters can affect their efficiency).

Indeed, a federal court in New York recently dismissed a lawsuit challenging a city law setting emissions limits for new buildings. *Ass'n of Contracting Plumbers v. City of New York*, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) (slip op.) at *14-*15. The court reasoned that the city's prohibition of high-emitting fuels in certain new buildings "does not have a connection

with EPCA's subject matter because it does not 'focus on' the performance standards applicable to covered products" and "does not draw any distinction between products based on their energy efficiency or energy use as manufactured." *Id*. at *13 (citing *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008)). The court observed that "[r]egulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral to municipal construction and fire codes." These core state and local regulations would be preempted under the Plaintiffs' reading of EPCA—"an absurd result that the Court must avoid." *Id.* (citing *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007))*; see also Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) (*citing Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)) (noting that the court is "to avoid 'interpretations of a statute which would produce absurd results'"). EPCA cannot reasonably be read to preempt the County BEPS program and other important County exercises of police power to protect health and safety.

## CONCLUSION

The undersigned *amici* urge this Court to uphold Montgomery County, Maryland's right to protect its residents and their environment by reducing the unsafe, unhealthy pollution from

buildings. For the reasons stated above, *amici* request that this Court grant Defendant's Motion and dismiss Plaintiffs' claims, with prejudice.

Dated: July 21, 2025                    Respectfully Submitted,

                                        /s/ *Susan Stevens Miller*
                                        Susan Stevens Miller (D.Md. Bar No. 06100)
                                        Earthjustice
                                        1001 G Street NW
                                        Washington, DC 20001
                                        (202) 667-4500
                                        smiller@earthjustice.org

                                        /s/ *Timothy R. Oberleiton*
                                        Timothy R. Oberleiton (pro hac vice pending)
                                        Earthjustice
                                        1001 G Street NW
                                        Washington, DC 20001
                                        (202) 793-5820
                                        toberleiton@earthjustice.org